Scott C. SECREST, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 503, 1994.

Supreme Court of Delaware.

Submitted: April 9, 1996.
Decided: May 31, 1996.
Rehearing Denied July 1, 1996.

John S. Malik, Wilmington, for Appellant.

William L. George, Jr., Deputy Attorney General, Department of Justice, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal of a conviction for second degree murder arising out of a motor vehicle collision where the central issue at trial was the identity of the driver, we hold that it was reversible error to admit into evidence, over objection asserting the physician-patient privilege, an admission to a treating emergency room physician by the defendant that he was the driver.

We also hold that the State violated Superior Court Criminal Rule 16 by failing promptly to disclose the substance of the opinions to be offered by its expert witness. In view of the reversal of the conviction and the need for a new trial, we need not decide whether the Rule 16 violation constituted reversible error or whether the Superior Court abused its discretion by refusing to grant a continuance for the defendant to present an expert witness in surrebuttal to counter the State's rebuttal expert. Nevertheless, for future guidance of trial courts and the Bar, we take this opportunity to address the standards relating to a motion for a continuance. Accordingly, we **REVERSE** the judgment and **REMAND** for a new trial.

## I. Facts

The defendant, Scott Secrest ("Secrest"), appeals the sentence imposed upon his conviction of second degree murder in the death of his friend, Barry Ashworth ("Ashworth"), in an automobile collision.[1] Secrest survived the accident and was found to have a blood alcohol level of .21%, more than two times the legal limit. The jury heard evidence that the Corvette in which Secrest and Ashworth were traveling reached speeds of over one hundred miles per hour before going into a spin and striking a stone wall. Both occupants were ejected from the car when it struck the wall. Ashworth was pronounced dead at the scene, and Secrest suffered serious injuries.

Secrest contended at trial that Ashworth was driving the car at the time of the accident and that the State could not prove beyond a reasonable doubt that Secrest was driving. The State offered testimony from numerous witnesses to show that Secrest was the driver. Carlo Rosauri loaned his 1987 Corvette to Secrest on Saturday, September 11, 1993, for repairs on the condition that it be returned by 3:30 that afternoon. When the car was not returned by dinner time, Rosauri reported the car as stolen to the Delaware State Police.

Around midnight that Saturday evening, Secrest drove the Corvette to Bogie's Pub on Kirkwood Highway, where he met Ashworth and two other companions, Loretta and Scott Ludwig. The four remained at the bar until closing time, when the Ludwigs invited Ashworth and Secrest to their home. Since Ashworth knew the way, he joined Secrest in the

---

1. Secrest was also convicted and sentenced for Unlawful Use of a Motor Vehicle, and Driving With a Suspended License. He did not contest these charges.

Corvette. The Ludwigs observed Secrest drive quickly, spitting gravel, from the parking lot of the bar, with Ashworth in the passenger seat. Scott Ludwig last saw the Corvette make a U-turn and go "flying" west on Kirkwood Highway in the direction of Newark.

Patrolmen Anthony Scelsi and Tom Mason of the New Castle County Police Department were working an extra-duty job in the parking lot of Alyson's Restaurant on Kirkwood Highway that night. They were sitting in their patrol cars talking when they heard the sound of squealing tires. They noticed a Corvette make a U-turn on Kirkwood Highway and head west toward Newark at a high rate of speed. Both officers joined in pursuit. After driving approximately one mile west on Kirkwood Highway, the officers could no longer see the Corvette. They decided to return to Alyson's.

Patrick O'Neal was working at a Texaco station on Kirkwood Highway that evening. He noticed a Corvette enter the station around 2:00 am. He remembered two young men standing around the car. One of the men walked to the window and paid two dollars for gas while the other pumped the gas. O'Neal did not see who was driving when the car left the station. He did, however, notice the car leave the station with its tires squealing. A short time later he noticed a police car traveling in the same direction.

As Patrolmen Scelsi and Mason were returning to Alyson's, Mason noticed a Corvette leaving a Texaco station on Kirkwood Highway. The car stopped at the exit from the station for a few seconds. Mason then heard tires squealing and saw in his rearview mirror the headlights extinguished as the car headed north on the street perpendicular to the Highway. Mason reversed back to the road and pursued the car, perhaps five to ten seconds behind. After continuing north on the road, Mason encountered an "eerie fog."

As he drew closer, he saw pieces of Corvette "everywhere."

He left his vehicle to search for the occupants. He eventually encountered Secrest lying on the grass to the side of the road with his legs folded underneath. Secrest appeared to be in "very bad shape" and "out of it." [2]

Scelsi arrived at the scene shortly after Mason. While surveying the scene, he discovered the body of Ashworth wrapped around the base of a tree some distance from the wreckage. He detected no signs of life.

Corporal James Rossi of the Delaware State Police also responded to the scene and he spoke with Secrest. He asked Secrest if he was alone, and Secrest responded that he was alone and was the driver. Rossi noticed that Secrest was moaning and drifting in and out of consciousness.[3]

Secrest was taken to Christiana Hospital by ambulance. Officer Peter Colyvas of the New Castle County Police arrived at the hospital shortly after Secrest. He went to the treatment room, where Secrest was surrounded by five or six medical personnel. Secrest had been placed in a cervical collar, and the trauma team had inserted intravenous tubes. Colyvas overheard Dr. Linda Weidner ask Secrest whether he had been driving. Secrest responded "yes."

Dr. Weidner initially treated Secrest at the emergency room. She testified that Secrest said he was driving the car. She also asked Secrest his name, the date and his location. He did not know the date or that he was in the hospital. Dr. Weidner testified that she asked these questions to assess Secrest's neurological functioning and aid in her diagnosis.

The State presented other witnesses who testified regarding statements made by Secrest. Todd Teder, a friend of Ashworth, telephoned Secrest at the hospital two or three days after the accident. Although he said he could not remember the accident,

---

**2.** Mason described his impression of Secrest's condition: "I had never seen a body so contorted like his body was at the time. It didn't look too promising."

**3.** Corporal Rossi testified:

> When I said are you alone, he's saying yeah. Mumbling sort of yes. So you're driving? Um-hum. You know, moaning type things to answer me yes.

Secrest told Teder, "I'm really sorry, I didn't mean it." Teder again telephoned Secrest at the hospital a few days later, and Secrest told Teder that Ashworth was driving. Scott Ludwig testified that Secrest, while in the hospital, told him "I'm real sorry I killed your friend." Susan Smoke testified that she spoke with Secrest by telephone while he was hospitalized. She told him, "I can't believe you killed my friend." He responded, "I know." Finally, a week before trial, the owner of the salvage yard where the wrecked Corvette was stored spoke with Secrest. Secrest told him that he was driving at the time of the accident.

Corporal Joseph Maichle of the County Police testified as an accident reconstruction expert. He offered his opinion, in the State's case-in-chief, with regard to how the accident occurred and the speed at which the car was traveling. Because of scheduling issues, the defense called Maichle to the stand during its case-in-chief and essentially conducted its cross-examination of Maichle. Defense counsel elicited from Maichle a concession that no physical evidence was found in the car which would indicate who was driving.

The State recalled Maichle during its rebuttal. Based on his knowledge of occupant kinematics,[4] Maichle testified that, in his opinion, Secrest was the driver and Ashworth the passenger. He displayed a diagram which overlaid the accident reconstruction diagram. He traced the trajectory of the occupants based on where they were found by the police officers.

Secrest testified that, after leaving the bar with Secrest driving the car, he and Ashworth stopped to purchase gas at the Texaco station. Since Ashworth knew the way to the Ludwigs' house, Ashworth drove the car after leaving the Texaco station. Secrest claimed to remember nothing of what he said at the accident scene or at the hospital. He denied telling Haley, the salvage yard owner, that he was driving the car.

Secrest also presented the expert testimony of Dr. Lawrence Spitz who testified that, in his opinion, Secrest was medically "confused" from the time of the accident through his five days of hospitalization and for a short time thereafter. Therefore, his statements to the police, Dr. Weidner, and others, during this period were "unreliable."

## II. Physician–Patient Privilege

Secrest contends that the testimony of Dr. Weidner and Officer Colyvas violated the physician-patient privilege of Delaware Rule of Evidence 503 ("D.R.E. 503"). Defense counsel filed a motion *in limine* seeking to exclude the testimony of Dr. Weidner and Officer Colyvas. The Superior Court concluded that the privilege was unavailable because Officer Colyvas overheard the conversation.

While motions *in limine* are reviewed for abuse of discretion[5], the Superior Court applied an interpretation of D.R.E. 503 to undisputed facts. Accordingly, the issue of the application of the privilege is subject to *de novo* review. *See Tackett v. State Farm Fire & Cas. Ins. Co.,* Del.Supr., 653 A.2d 254, 258 (1995) (*de novo* review of claims of lawyer-client privilege).

Rule 503 provides, in relevant part:

(b) **General Rule of Privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing *confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.*

A confidential communication is defined as follows:

A communication is "confidential" if not intended to be disclosed to third persons,

---

4. Occupant kinematics is the study of the effect of accidents on occupants of vehicles. It can be used to determine the initial origin of a human body based on its resting place and the nature of the vehicle impact.

5. *Lampkins v. State,* Del.Supr., 465 A.2d 785, 790 (1983).

except persons present to further the interest of the patient in the consultation, examination or interview, persons reasonably necessary for the transmission of the communication or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

D.R.E. 503(a)(4)

■ The claimant has the burden of establishing the elements of the physician-patient privilege. *State v. Randle*, Iowa Ct.App., 484 N.W.2d 220, 221 (1992); *Williams v. People*, Colo.Supr., 687 P.2d 950, 953 (1984); *People v. Decina*, 2 N.Y.2d 133, 157 N.Y.S.2d 558, 565, 138 N.E.2d 799, 804 (1956); *cf. Moyer v. Moyer*, Del.Supr., 602 A.2d 68, 72 (1992) (burden on claimant to establish elements of lawyer-client privilege).

This Court has not previously considered the effect of the presence of a third party on the physician-patient privilege. Earlier cases and treatises have held that a communication is not confidential if overheard by a person not necessarily present at the treatment. As stated in one treatise:

[The physician-patient privilege] therefore does not exempt a *third person* who overheard the communication (with or without the knowledge of the patient) from testifying to it unless the third person is an agent of the physician.

8 Wigmore, *Evidence* § 2381 at 833 (McNaughton rev. 1961); *see also State v. Thomas*, 78 Ariz. 52, 275 P.2d 408, 416 (1954) ("very presence [of a third person] neutralizes the confidential character of the interview and the privilege should not attach"); *see also State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988); *State v. Lewis*, Mo.Ct.App., 735 S.W.2d 183, 187 (1987) (mere presence of third person vitiates privilege).

The rule vitiating the privilege makes sense in situations where the patient is reasonably lucid and able to control access to the setting. The text of D.R.E. 503 focuses on the intent of the patient. *State v. Locke*, App., 177 Wis.2d 590, 502 N.W.2d 891, 897 (1993) (interpreting language similar to Uniform Rule of Evidence 503). In some cases, as here, a patient's lack of intent that a

communication not be disclosed can readily be inferred from the surrounding circumstances.

The leading case adopting such an approach is *People v. Decina*, 2 N.Y.2d 133, 157 N.Y.S.2d 558, 138 N.E.2d 799 (1956). The court in *Decina* rejected the approach that vitiates the privilege because of the mere presence of a third person, stating: "[I]f the communication was intended to be confidential, the fact that it may have been overheard by a third person does not *necessarily* destroy the privilege. . . ." *Id.*, 157 N.Y.S.2d at 569, 138 N.E.2d at 807 (emphasis supplied). The Court considered "whether in the light of all the surrounding circumstances, and particularly the occasion for the presence of the third person, the communication was intended to be confidential. . . ." *Id.* McCormick suggests the same approach:

Whether this principle is to be applied when the stranger is a police officer who has escorted the patient to the hospital or doctor's office should, it would seem, turn on whether *meaningful acquiescence* on the patient's part is to be found on the facts.

1 McCormick, *Evidence* § 101 at 377 (4th ed. 1992) (emphasis supplied); *State v. Kunz*, Minn.Ct.App., 457 N.W.2d 265, 267 (1990) (acquiescence of patient); *State v. Deases*, Iowa Supr., 518 N.W.2d 784, 788 (1994) (presence of prison guard did not vitiate privilege where presence of guard was necessary for treatment—not a "casual observer").

■ Secrest was disoriented. Dr. Weidner testified that he did not know the date or his location when he arrived at the hospital. Later, he told Dr. Weidner that he was being chased and that he had been sitting in the back seat of the Corvette, a car without a back seat. Moreover, Secrest did not know that an officer was present. He was strapped to a gurney with a cervical collar around his neck, in a trauma room surrounded by several medical personnel. He had no reason to suspect that a police officer was in the room. In fact, Dr. Weidner testified that Secrest stopped talking when he noticed the officer in the room. Considering his apparent ignorance of the presence of the police

officer and his neurological deficit, his intent to disclose cannot be inferred from the surrounding circumstances.

■ The error was not harmless. To be sure, there was testimony of Secrest's other admissions,[6] but the statement to Dr. Weidner was a crucial and unequivocal admission which was made very close in time to the accident. Accordingly, we hold that it was reversible error to permit this testimony to be presented to the jury.

### III. Superior Court Criminal Rule 16

Secrest claims that the State violated Superior Court Criminal Rule 16 by failing to disclose that it intended to offer, in rebuttal, Maichle's expert opinion that Secrest was the driver. Defense counsel objected to the testimony and requested that the testimony be excluded or, alternatively, that the Superior Court grant a continuance so that Secrest could offer in surrebuttal the opinion of his accident reconstruction expert.

■ The defendant argues that this issue should be reviewed under an abuse of discretion standard, citing *Ray v. State*, Del.Supr., 587 A.2d 439, 441 (1991) (discovery violations subject to reversal if substantial rights of the accused are prejudicially affected)[7]. The State argues that the plain error standard should apply since the defendant failed to raise this issue below. The State is incorrect. Defense counsel objected strenuously to what he termed "sandbagging." *See Johnson v. State*, Del.Supr., 550 A.2d 903, 913 (1988). Thus, Secrest preserved this issue for review.

Defendant's expert, George Govatos, Ph.D., was unable to conclude to a reasonable degree of probability, based on the available data, whether Ashworth or Secrest was driv-

ing. Therefore, Secrest did not present this inconclusive testimony in his case-in-chief. Once the State offered expert occupant kinematics testimony, Secrest sought a continuance to counter with his expert's contrary opinion that it was not possible to conclude from the available data whether Secrest or Ashworth was driving the car at the time of the accident, thus creating a reasonable doubt on this issue. The trial judge allowed the expert testimony of Maichle on the basis that the defense could present an expert in response, but then denied a continuance for the expert surrebuttal testimony.[8]

The State responds that Maichle did not actually form his opinion until the Friday before he testified on Monday. He began work on the occupant kinematics theory only when defense counsel indicated in opening statements that he would argue that Ashworth was the driver. The State claims that it did not anticipate this defense strategy and, therefore, had not prepared occupant kinematics testimony prior to trial.

■ Superior Court Criminal Rule 16(a)(1)(E) provides:

(E) **Expert Witnesses.** Upon request of a defendant, the state shall disclose to the defendant any evidence which the state may present at trial under Rules 702, 703, or 705 of the Delaware Uniform Rules of Evidence. This disclosure shall be in the form of a written response that includes the identity of the witness and the substance of the opinions to be expressed.

Superior Court Criminal Rule 16(c) provides:

(c) Continuing Duty to Disclose. If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to

---

6. Secrest told an officer at the accident scene that he was alone and driving the car. Secrest told Todd Teder that he was sorry, but Secrest later told Teder that Ashworth was driving. He told Scott Ludwig "I'm sorry I killed your friend." Susan Smoke testified to a similar conversation. Finally, the week before trial, Secrest told the salvage-yard owner that he was driving the car. Thus, these admissions furnish substantial evidence from which the jury could infer that Secrest was driving, but the evidence is not overwhelming, and it is equivocal in some respects.

7. Secrest cites *Ray* to stand for an abuse of discretion standard of review. This Court appeared to apply, however, plenary review.

8. Dr. Govatos was scheduled to testify the next day in a Philadelphia court. The record is not clear, even after remand and supplemental findings by the trial judge, whether the trial judge denied the continuance knowing that only a one-day delay was involved.

discovery or inspection under this rule, such party shall promptly notify the other party ... of the existence of the additional evidence or material.

Rule 16 is interpreted broadly, and the State has a continuing duty to disclose information subject to a discovery request. *Ray v. State*, 587 A.2d at 441.

■ The State failed to disclose "the substance of the opinions to be expressed" by Maichle as soon as it decided, on the previous Friday at the latest, that he would testify that, in his expert opinion, Secrest was the driver. The State argues, unconvincingly, that the disclosure duty extends only to opinions it intends to introduce in its case-in-chief. The text of the Rule, however, contains no such limitation. *Johnson v. State*, 550 A.2d at 913.

The opinion and accompanying charts were completed on Friday, and Maichle testified on Monday. The defense expert faced a scheduling conflict the next day, Tuesday, and the trial judge denied a continuance. The State could have notified defense counsel earlier of its intention (which was formed after hearing defense counsel's opening statement) to present Maichle's opinion testimony in rebuttal. The State could have notified Secrest on Friday when Corporal Maichle reached his conclusions. Defense counsel could have attempted to schedule witnesses accordingly. Instead, defense counsel, after the State completed its case-in-chief, believed that he would not need Dr. Govatos to counter an occupant kinematics opinion. Understandably, he made no effort to ensure Dr. Govatos' availability. Thus, there was a disclosure violation.

■ When reviewing a disclosure violation, this Court applies a three-part test: "(1) the centrality of the error to the case, (2) the closeness of the case, and (3) the steps taken by the court to mitigate the results of the error." *Skinner v. State*, Del.Supr., 575 A.2d 1108, 1126 (1990).

Here, the trial judge did not find a disclosure violation, and no steps were taken to mitigate the results of the error. In this case, however, any error with respect to Rule 16 may have been harmless.[9] But we need not decide whether or not the error was harmless because our decision to reverse on other grounds renders that issue moot.

## IV. The Continuance

■ Secrest argues that the trial court abused its discretion, whether or not the State violated Rule 16, by denying his request for a continuance in order to secure the testimony of his accident reconstruction expert. Requests for continuances "are left to the discretion of a trial judge whose ruling will not be disturbed on appeal unless that ruling is clearly unreasonable or capricious." *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1088 (1987). This Court has not elaborated precise standards for assessing a request for a continuance, but has stated generally:

There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Riley v. State*, Del.Supr., 496 A.2d 997, 1018 n. 27 (1985) (*quoting Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964)); *Bailey*, 521 A.2d at 1088.

Other jurisdictions have articulated more precise standards for assessing continuance requests. There is uniform agreement that trial judges enjoy wide discretion to decide requests for a continuance. *United States v. Saccoccia*, 1st Cir., 58 F.3d 754, 770 (1995). This deference supports

[an] important public interest in the efficient operation of the judicial system and in the orderly management of crowded dockets.... The ... [trial] judge is at the helm, sensitive to the tides that ebb and flow during a prolonged trial and knowledgeable about systemic demands. [The

---

**9.** A Rule 16 violation does not require reversal if "significant evidence, independent of [the undisclosed testimony], was before the jury...." *Skinner*, 575 A.2d at 1126. Secrest was the last

person seen driving the car, and the State presented several witnesses who testified that Secrest admitted to driving the car at the time of the accident. *See* note 6, *supra*.

trial judge] ... is, therefore, the person best equipped to balance the competing considerations.

*United States v. Devin,* 1st Cir., 918 F.2d 280, 291 (1990). This discretion should be limited, however, by the recognition that "a rigid insistence by the court upon expedition of trial in the face of a justifiable request for delay can render the right to defend an empty formality." *Kimes v. United States,* D.C.App., 569 A.2d 104, 114 (1989) (*quoting O'Connor v. United States,* D.C.App., 399 A.2d 21, 28 (1979)).

Appellate courts generally require the defendant to show: (1) an abuse of discretion in applying the applicable standards, and (2) serious prejudice. *Saccoccia,* 58 F.3d at 770; *State v. Damon,* 214 Conn. 146, 570 A.2d 700, 708 (1990) ("substantially impaired the defendant's ability to defend himself"); *Kimes,* 569 A.2d at 114; *accord United States v. Ross,* 5th Cir., 58 F.3d 154, 159 (1995) ("seriously prejudiced by the denial"); *United States v. Verderame,* 11th Cir., 51 F.3d 249, 251 (1995) ("specific substantial prejudice"); *United States v. Robertson,* 9th Cir., 15 F.3d 862, 873 (1994) ("actual prejudice").

While courts may differ on the specific language, the factors to be considered exhibit a degree of uniformity. The Maine Supreme Court has stated, for example:

> The party seeking the continuance has the burden of establishing [1] that the evidence sought will be relevant and competent, [2] that a continuance will make its procurement likely, [3] that due diligence was used to obtain the evidence before the commencement of trial, and [4] that the length of the continuance sought is reasonable.

*State v. Dechaine,* Me.Supr., 572 A.2d 130, 132–133 (1990); *accord Smith v. State,* 103 Md.App. 310, 653 A.2d 526, 532 (1995); *Kimes,* 569 A.2d at 114. The Ninth Circuit has adopted a somewhat different four-part test:

> We do not find an abuse of discretion unless the denial is arbitrary and unreasonable given the following four factors:
>
> (1) the extent of the defendant's diligence in readying the defense;

> (2) the likelihood that the continuance would have satisfied the defendant's need;
>
> (3) the inconvenience to the court, opposing party, and witnesses; and
>
> (4) the extent to which the defendant may have been harmed.

*United States v. Robertson,* 15 F.3d at 873. The Eleventh Circuit has a four-part test which looks to similar factors: (1) diligence, (2) probability of obtaining testimony within a reasonable time, (3) specificity with which the defendant articulated the proposed testimony, and (4) the favorable degree of the testimony. *United States v. Cross,* 11th Cir., 928 F.2d 1030, 1048 (1991).

In this case, Secrest argues that he was "sandbagged," or surprised, by the State's introduction in rebuttal of expert testimony regarding occupant kinematics. This is different from a case where a defendant requests a continuance during his or her case-in-chief. Secrest had no reason to present inconclusive expert testimony during his case-in-chief since the State had not presented expert testimony during its case.

The record does not reflect that Secrest asked specifically for a one-day continuance. Defense counsel maintains that he mentioned to the trial judge in the hallway that he would be seeking a one-day continuance. The trial judge and the prosecutor, however, have no recollection of such a statement. The record reflects, therefore, that defense counsel requested a continuance of undefined duration in order to present the surrebuttal testimony of his expert witness. As an offer of proof, he stated the conclusions that his witness had reached. The record also reflects that the expert had completed his work and was prepared to testify as soon as his schedule permitted. The offer of proof reflects that Dr. Govatos reached a conclusion before trial.

Even without a specific time-frame, it is apparent from the record that the request could not have necessitated a lengthy continuance. This was not a request which would involve an indefinite delay so that defense counsel could retain an expert, have him perform an analysis and reach conclusions. *Compare State v. Chambers,* Me.Supr., 624

A.2d 473, 474 (1993) (defendant must show "more than a whimsical hope that more time to investigate might produce additional exculpatory evidence").

We are particularly concerned here that the trial record relating to the request for a continuance is unclear. We reiterate our concern that office conferences and sidebars be reported. *See Matter of Butler*, Del. Supr., 609 A.2d 1080, 1082 n. 3 (1992). Since the judgment here must be reversed because of the admission of the testimony protected by the physician-patient privilege, we need not decide whether the denial of the continuance, standing alone, would have constituted error, or if so, whether that error was harmless.

■ For the future guidance of the trial courts and the Bar, we set forth the following standards to be applied where a continuance is sought under similar circumstances:

First, the party seeking the continuance has the burden of establishing a clear record of the relevant facts relating to the criteria for a continuance, including the length of the requested continuance. Second, the party seeking the continuance must show:

(a) that it was diligent in preparing for the presentation of the testimony;

(b) that the continuance will be likely to satisfy the need to present the testimony; and

(c) that the inconvenience to the Court, opposing parties, witnesses and jurors is insubstantial in relation to the likely prejudice which would result from the denial of the continuance.

## V. Conclusion

Accordingly, we **REVERSE** the judgment of the Superior Court, based on the violation of D.R.E. 503, and **REMAND** for a new trial.