# IN THE COURT OF APPEALS OF IOWA

No. 21-1419
Filed October 5, 2022

**IN RE THE MARRIAGE OF KELLI ANNE NARDONE
AND JOHN WILLIAM NARDONE, SR.**

**Upon the Petition of**
**KELLI ANNE NARDONE, n/k/a KELLI ANNE SELL**
     Petitioner-Appellant,

**And Concerning**
**JOHN WILLIAM NARDONE, SR.,**
     Respondent-Appellee.

_____

Appeal from the Iowa District Court for Pottawattamie County, Greg W. Steensland, Judge.

The former wife appeals provisions in the dissolution decree regarding property distribution, life insurance, and spousal support. **AFFIRMED AS MODIFIED.**

Amanda Heims, Council Bluffs, for appellant.

Brady J. Hoeskstra of M F Law Omaha, Omaha, Nebraska, for appellee.

Considered by Tabor, P.J., Badding, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**BLANE, Senior Judge.**

Kelli Nardone appeals the district court's dissolution decree, arguing the court failed to address John Nardone's life insurance cash value in the property distribution, failed to order John to maintain a life insurance policy with her as the beneficiary, and awarded inadequate spousal support. Both parties also request appellate attorney fees. Upon our de novo review, we modify as to cash value of the life insurance, otherwise affirm the decree, and decline to award appellate attorney fees.

## I. Procedural and factual background

The parties were married for twenty-two years. John was in the United States Air Force and retired in 2018. He receives a pension of $3090 per month and disability retirement due to service-related injuries of $2283 per month.[1] Since leaving the military, John has been employed with Lincoln Technical Institute and earned $83,707 in 2019. Kelli has been employed the past eleven years as a dental hygienist/office manager and earns a salary of $47,426 per year. At trial, Kelli requested spousal support of $1000 per month. The court's decree ordered spousal support of $550 per month until Kelli qualifies for Medicare, remarries, or either party dies. The court also awarded Kelli one-half of John's military pension through a qualified domestic relations order.[2]

---

[1] The parties agree that John's military disability payments are not subject to division in the dissolution. *See In re Marriage of Erlandson*, 973 N.W.2d 601, 606 (Iowa Ct. App. 2022)

[2] Petitioner's Exhibit 20, a pamphlet entitled Military Divorce Guide, advises that since a military retirement is not a qualified pension under section 401(a) of the Internal Revenue Code, it should not be divided by a qualified domestic relations order, but should be divided using Defense Finance and Accounting Services forms. Neither party raised this issue.

John retired two months before Kelli would have qualified for life-time spousal military medical benefits (TRI-CARE). Upon their divorce, Kelli will be able to retain her health insurance for one year and then will become responsible for purchasing a health policy at a cost of $533 per month until she qualifies for Medicare. After dividing the parties' assets and liabilities, the court ordered John to make an equalization payment to Kelli of $85,096.

Following the decree, Kelli filed a motion in which she argued the court had failed to include in the decree any ruling regarding John's life insurance. The court ruled it would "not modify or amend its Decree with regard to life insurance." Kelli appeals.

## II.      Standard of review.

Dissolution-of-marriage actions are reviewed de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "Accordingly, we examine the entire record and adjudicate anew the issue of the property distribution." *Id.* While we give weight to the findings of the district court, particularly about the credibility of witnesses, we are not bound by them. *Id.*; *see also* Iowa R. App. P. 6.904(3)(g). The district court's ruling will be disturbed only when it fails to do equity. *Id.*

## III.      Discussion.[3]

## A.  Life Insurance.

In her initial brief Kelli argues that she should be awarded one-half of the cash value of John's life insurance policy, that he be required to designate her as

---

[3] In her reply brief, Kelli argues that John's appellee brief failed to contain citations to the record under Iowa Rule of Appellate Procedure 6.903(3), which references rule 6.903(2)(g)(3), and his brief should be stricken. The referenced rule states the brief is to contain: "An argument containing the appellant's contentions and the

a beneficiary, or that she be allowed to take out a life insurance policy on John's life. In her reply brief, she refines her argument that she is not requesting John purchase a new life insurance policy. John urges that, like the district court, we need not address life insurance.

While in the military, John had a policy with a death benefit of $400,000. When he retired, John had the option to keep the military policy but had to pay the premiums. John was starting new employment with Lincoln Tech, which also offered a life insurance package that had less expensive premiums than the military option. John and Kelli discussed this and agreed to let the military policy lapse and purchase the life insurance through Lincoln Tech. This was a universal life policy with a death benefit of $350,000 that would accrue a cash value. At the time of the dissolution trial the cash value was $8979, which the district court noted in the decree. A chart in the decree calculated the equalization payment but it did not include the life insurance cash value.

Under Iowa dissolution law, all marital property must be equitably divided unless inherited or gifted. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). "As tedious as the chore may be, the district court has the obligation to equitably divide 'all' of the marital property between the parties in a decree." *In re Marriage of Sundby*, No. 20-1552, 2022 WL 946508, at *7 (Iowa Ct. App. Mar. 30, 2022) (quoting Iowa Code § 598.21(1), (5) (2021)). Cash value of life

---

reasons for them with *citations to the authorities* relied on and *references to the pertinent parts of the record* in accordance with rule 6.904(4). Failure to cite *authority* in support of an issue may be deemed waiver of that issue." (Emphasis added.) Although John may have failed to reference the record, he cited legal authority to support his positions, and Kelli misreads the rule.

insurance is a marital asset. *In re Marriage of Goodwin*, 606 N.W.2d 315, 322 (Iowa 2000) ("We first point out that the cash value of the life insurance policy on [husband] was a marital asset."). We therefore modify the decree and require John to pay Kelli one-half of the life insurance cash value, an additional $4489.50 in equalization of assets and liabilities.

Next, Kelli requests that the decree be modified to require John to maintain a life insurance policy with her designated as the beneficiary. She argues that this is just and equitable since, upon John's death, she will no longer receive one-half of his military retirement and her spousal support will also cease. John contends that since his support obligation ends upon either his death or Kelli's, he should not be required to carry a life insurance policy with her designated as a beneficiary.

"The general rule followed in Iowa is that alimony payments are presumed to terminate at the death of the payor." *In re Marriage of Weinberger*, 507 N.W.2d 733, 736 (Iowa Ct. App. 1993). However, section 598.21A "is broad enough to permit alimony payments after death." *Id*.; *see* Iowa Code § 598.21A(1) (providing "the court may grant an order requiring support payments to either party for a limited or indefinite length of time").

Here, the district court decree terminates the spousal support obligation upon the death of either party. Under those circumstances, our appellate courts have held that the obligor spouse need not maintain a life insurance policy. *In re Marriage of Debler*, 459 N.W.2d 267, 270 (Iowa 1990) (finding an alimony payor may be required to designate the alimony payee as the beneficiary of the payor's life insurance policy for as long as his spousal support obligation continues); *In re Marriage of Fitzgerald*, No. 14-1729, 2015 WL 3625040, at *4 (Iowa Ct. App. June

10, 2015) (finding where spousal support obligation terminates upon death of either party, husband not required to maintain life insurance policy); *In re Marriage of Eastman*, No. 20-1677, 2021 WL 5106074, at \*4 (Iowa Ct. App. Nov. 3, 2012) ("[T]here is no need for life insurance to pay spousal support after [husband]'s death because his obligation ceases upon his death."); *In re Marriage of Mouw*, 561 N.W.2d 100, 102 (Iowa Ct. App. 1997) (finding the obligation to provide life insurance may be limited to the amount necessary to secure the alimony obligation); *In re Marriage of Lytle*, 475 N.W.2d 11, 12 (Iowa Ct. App. 1991) (finding former husband was not in contempt for failure to maintain life insurance with the former wife as beneficiary when support obligation ended on death of either party). We find no basis to require John to maintain a life insurance policy or to designate Kelli as a beneficiary.

### B. Spousal support.

At trial, Kelli requested the court award her $1000 per month in spousal support. The court awarded her $550 per month. On appeal, she re-urges her request for $1000 per month. She argues the criteria found in Iowa Code section 598.21A(1) favor such an award.[4] Our review "need only mention those criteria relevant to the particular case." *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020); *see also* Iowa Code § 598.21A(2). Our cases supplement "the

---

[4] These criteria include: length of marriage, age and physical and emotional health, distribution of property, educational level of parties at time of marriage and time dissolution action commenced, earning capacity of the party seeking maintenance, feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve that goal, and tax consequences of the spousal award. *See* Iowa Code § 598.21A(1)(a)–(j).

statutory mandate to consider each criterion set forth in section 598.21A(1)" by "establish[ing] the comparative weight or importance of certain statutory criteria relative to others." *In re Marriage of Mauer*, 874 N.W.2d 103,107 (Iowa 2016). We also note our supreme court's caution: "In reviewing questions related to spousal support, while our review is de novo, we have emphasized that 'we accord the trial court considerable latitude.' We will disturb the trial court's order 'only when there has been a failure to do equity.'" *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015) (citations omitted).

> "The question of whether to award alimony is a matter of discretion and not a matter of right." The decision to award alimony depends on the particular facts and circumstances of each case. "The legislature has not authorized Iowa courts to employ any fixed or mathematical formula in applying spousal support." Instead, courts are instructed "to equitably award spousal support by considering" the criteria listed in Iowa Code section 598.21A(1).

*In re Marriage of Pazhoor*, 971 N.W.2d 530, 538–39 (Iowa 2022), *as amended* (Apr. 6, 2022), *reh'g denied* (Apr. 6, 2022) (citations omitted). We evaluate those criteria.

*1. Length of marriage.* The parties were married for twenty-two years. This meets the criteria for traditional spousal support. *Gust*, 858 N.W.2d at 410–11 ("Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support."). Traditional alimony is primarily predicated on need and ability. *Id.* at 411. In determining need, we focus on the earning capability of the spouses, not necessarily on actual income. *Id.* With respect to duration, an award of traditional spousal support is normally payable until the death of either party, the

payee's remarriage, or until the dependent is capable of self-support at the lifestyle to which the party was accustomed during the marriage. *Id.*

2. *Age and physical and emotional health.* At trial, John was forty-six years old (born in 1975) and Kelli was fifty-two (born in 1969). John suffered military service injuries such that he qualifies for military disability payments. But these health issues do not appear to limit his current employment or life expectancy. Kelli experienced non-Hodgkin's lymphoma but following treatment it is in remission. It does not currently affect her physical activity or work. Its potential impact on life expectancy was not addressed. Neither party has any emotional health issues.

3. *Distribution of property.* The parties accumulated assets in excess of $270,000 during the course of the marriage. Those have been equitably divided and John was ordered to pay Kelli an equalization of $85,096, resulting in each party receiving approximately $135,000. We have added an additional equalization payment of $4,489, for a total of $89,586 to Kelli. "We consider alimony and property distribution together in assessing their individual sufficiency. They are neither made nor subject to evaluation in isolation from one another." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). "[I]n calculating spousal support, it is proper to look at the assets each party received. We do so to determine the income potential of the property distributed to each party." *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 487 (Iowa 2012). We also note that John took a significant portion of the marital debt.

4. *Educational level of parties at time of marriage and time dissolution action commenced.* Kelli attended dental assistant technical school and also has

an associate's degree in business management so as to serve as the office manager of a dental office. John received training in the Air Force sufficient to allow him to be employed as an instructor at Lincoln Technical Institute.

*5. Earning capacity of the party seeking maintenance.* At trial the evidence was that Kelli earned $47,426 per year. Since she earned this income from her employment as a dental office business manager, it fairly represents her earning capacity.

*6. Feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve that goal.* With her current income, Kelli is self-supporting. The question is whether this is at a standard of living reasonably comparable to what she enjoyed during the marriage. Kelli has worked at least the last eleven years of the marriage, apparently earning income similar to what she does now with periodic raises. For most of the marriage, John was career military. We do not have information on his past military income. Upon retirement, he started receiving his military pension and military disability and began employment with Lincoln Technical Institute at $83,707 per year. Generally speaking, the parties had a comfortable standard of living; neither extravagant nor minimal.

*7. Tax consequences of the spousal award.* "Under recently enacted federal tax law, alimony payments are no longer tax deductible [for the payor] and are not considered taxable income to the person receiving them." *Pazhoor*, 971 N.W.2d at 539 (citation omitted). This results in enhancing the burden on the payor

and enhancing the value of the award to the payee. *Id.* at 542. However, John's military and disability pensions are not subject to income taxes.

8. In addition to the statutory criteria, the supreme court has held the comparative income of the spouses is another factor for the court to consider when evaluating an award of spousal support. *See Schenkelberg*, 824 N.W.2d at 486–87. As noted above, Kelli earns $47,426 per year; John earns $83,707 per year. John has a military pension of $3,090 per month, which the court ordered split with Kelli so that she receives $1,545 each month. This results in Kelli's gross monthly income of $5,497 and John's of $8,520.[5]

The district court awarded Kelli $550 per month. This results in Kelli's monthly income of $6,047, while John's is reduced to $7,970. This results in an approximate disparity of 14% (43% to 57%). This is within a percentage disparity acceptable under supreme court precedent. *See Gust*, 858 N.W.2d at 412 ("We have, however, approved spousal support where it amounts to approximately thirty-one percent of the difference in annual income between spouses."); *In re Marriage of Michael*, 839 N.W.2d 630, 638 & n.7 (Iowa 2013). After considering "all" the factors in 598.21A(1)), *see Gust*, 858 N.W.2d at 408, we find the district court award did not amount to a failure to do equity and affirm the decree in this regard.

---

[5] For Kelli, a monthly salary of $3952 plus $1545 equals $5,497; and for John, monthly income of $6975 plus $1545 equals $8,520. The total of both incomes is $14,017. Kelli's portion is 40% and John's 60%.

**C. Appellate attorney fee.**

Both Kelli and John request appellate attorney fees. In determining whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal. *McDermott*, 827 N.W.2d at 687. There is no right to an award of attorney fees, but the decision rests in our discretion. *Id.* After carefully considering each of these factors, we find both parties shall pay their own attorney fees in this appeal. Costs on appeal shall be assessed equally between the parties.

**AFFIRMED AS MODIFIED.**